The League of Women Voters of Florida is here as amicus, Mohamed Ojaziel is here for the appellant, the Florida Secretary of State, Adrielle Cepeda-Derriere is here for the appellees, Florida State Conference of Branches along with Abha Khanna, and Robert B. Ferguson is here for the amicus, and Mr. Ojaziel, you may begin your argument. Thank you, Your Honor. May it please the court, Mohamed Ojaziel for the Florida Secretary of State and the Attorney General. Your Honor, these two bureaus are one of the many ways by which Florida voters can register to vote. These two bureaus, in common parlance, are the folks who are out in the community as canvassers with a clipboard and a registration form trying to get people to register to vote. Now, Florida's experience has been that there are some problems with three PDROs. In 2022 alone, 3,077 voter registration forms were untimely delivered. In the report that the Florida Secretary of State's office shared with the legislature in 2022, there were third-party voter registration groups who were committed to that. They were hiring fellows without appropriate checks, et cetera. So the Florida legislature, in response, passed a series of reforms directed at third-party voter registration groups. Two of those reforms are the subject of this appeal in a preliminary injunction context. It's the requirement that folks who are collecting third-party voter registration forms for three PDROs be citizens of the United States. Now, the state's second issue concerns what information can be retained from the form. The first issue is an equal protection issue. The second one is in the vagueness context. Your Honor, on the citizenship provision, the state's argument is this, that when we're looking at citizenship, it's sui generis. When we're looking at the equal protection analysis in a facial constitutional challenge context, alienage is unlike race, alienage is unlike religion, alienage is unlike national origin. Whereas with race, if you're white or black, strict scrutiny applies. National origin, Irish, Italian, strict scrutiny applies. With race, the level of scrutiny varies depending on the kind of alien that you are. So for legal permanent residents, strict scrutiny applies. For everyone else, rational basis is the appropriate test. Are you conceding that this rule is invalid for legal permanent residents? I'm not conceding that. I'm saying that for everyone but the legal permanent resident, rational basis should apply and it's met. And for the legal permanent residents, there's political function exception based on Supreme Court case law. And here, what we're contending for the legal permanent residents, the political function exception would apply, which then in itself triggers rational basis review. And the political function exception, Your Honor, if we look at the constellation of our alienage cases, you've got Yikwu, which is... Your Honor, it's inherent in the works that when you have the word citizen, included within that word are all the various classes of citizens. So if, for example, we have a law that says black school children can't use a water fountain, there you've got a very specific designation that's based on race. And we know that strict scrutiny... And what's your authority for this bifurcated approach? Your Honor, there is no authority one way or the other on this bifurcated approach for alienage. My point is this, that the alienage cases make sense and you have to consider in a facial context the word citizen to include all the subclasses of... Well, I guess what Judge Wilson is trying to ask is there is not a Supreme Court case that addresses a classification where it involves both non-citizens who are here lawfully and non-citizens who are here unlawfully. That's correct, Your Honor. So the way I understand the alienage cases is, from Graham on, is that they're alienage cases that deal with non-citizens who are in the country lawfully. That they're lawful permanent residents or they have some kind of visa, but they normally, that's why they have the strict scrutiny analysis. Yes, Your Honor. And I think the key point there is when we look at these cases, it's legal permanent residents who are bringing them. It's legal permanent residents who are challenging them. And these cases exist. The most recent one is 1984 Burnell, three years before Salerno, before we started carving out a clear distinction between facial and as-applied challenges. In these cases, it makes sense if you consider those as-applied challenges that are being filed by legal permanent residents. Cabell, which is a 1982 case, was a certified class of legal permanent residents. So here what we're talking about is solely a facial constitutional challenge, right? Yes, Your Honor. It's not an as-applied? It is not an as-applied challenge. And so my understanding now is that under, at least I think SCOTUS at this point has really clarified that there's a strict standard for facial constitutional challenges. Precisely. And that's Salerno. Yes, Your Honor. And so I guess the question is, do we apply Salerno? Does it apply even though you have citizens, non-citizens who are here? So you do have two different standards of review? Your Honor, so if we're using Salerno as the framework and we're assessing this as a facial challenge, it's not brought by legal permanent residents as an as-applied class, like Cabell, for example. And we're trying to figure out, okay, in this facial challenge, who's the in-group and who's the out-group? The in-group is U.S. citizens. The out-group is non-citizens. The out-group, the non-citizen group, is then, by definition, based on the U.S. Supreme Court case law, divided into different subcategories. For legal permanent residents, strict scrutiny applies. For everyone else, rational basis applies. So if we're going through a Salerno analysis, then the question becomes, okay, for the out-group, what level of scrutiny should we apply? But does, I guess the question is, does it matter what the level of scrutiny is? Because don't you have to, to survive Salerno, the Salerno constitutional test, you have to meet every set of circumstances in order for the facial challenge to prevail? Yes, Your Honor. And so for the plaintiffs to then prevail based on that test, they have to show that the statute would be unconstitutional when applied to the temporary worker, the illegal alien, et cetera. I think that's a very reasonable argument based on Salerno. The problem is, it seems like we've already addressed that in Club Madonna. And I didn't see in your briefs where you really dealt with the problem for you presented by Club Madonna. Thank you, Your Honor, and I'd like to do that. Club Madonna should be viewed together with the other pieces of Club Madonna. Club Madonna cites, for example, the Doe case from the Tenth Circuit. Club Madonna does not cite Patel, but it's cited in my friend's papers. And I think what Club Madonna is saying is that when you're looking at the official challenge and you're assessing whether or not the defendant is trying to put forward a hypothetical, the hypothetical must be relevant to the prohibition that's being applied. And in Club Madonna, the argument that was being made by the local government was that, hey, our provision concerning the need to check the immigration status of your independent contractors is not relevant because the club has employees. And I think the way that Club Madonna should be read is the way Patel, Justice Sotomayor, described the distinction. It's the provision that's at issue does not concern employees. So having a hypothetical that does not fall within the ambit of the ordinance doesn't make sense. And I think the example is clear if we consider the facts of Patel. And Patel was the city of Los Angeles saying that police officers can go ahead and look at the information for anyone staying at a motel. And the city defended by saying, well, look, that's not a problem because in instances where there's a search warrant, not at issue. Perfectly fine. In instances where the motel consents, not at issue. Perfectly fine. And Justice Sotomayor, writing for the court, said, well, that's a hypothetical. That's irrelevant to the analysis because the person with the search warrant doesn't fall within its ambit. The person who has consented doesn't fall within its ambit. And so that to me is how you look at Club Madonna, Patel. If your statute had separate provisions for legally present immigrants or people and illegally present people, then I think that might be closer. But the law doesn't distinguish between the two. And I have a little bit of trouble understanding your argument. Maybe you can help me. If you say that even the LPR group of people satisfy strict scrutiny because of the public functions exception, then why don't you just rely on that? Your Honor, I'm making a two-part argument. The public function exception, you said this in our brief, it's difficult to sometimes reconcile all the public function cases. The public function cases, I might lose on that issue, which is why I'm pushing the Salerno argument as well, because this is at its core a facial challenge. But are you saying that we should – are you wanting us to say because the law would be upheld for LPRs, for illegal immigrants, that we should also uphold it for LPRs? I'm not sure what relief you're seeking. Your Honor, the court can do two things. The court can say the law. Well, it's constantly the same with all kinds of noncitizens, from the illegal alien to the legal permanent resident. But we know that even for the legal permanent resident, the public – the political function exception applies, so rational basis is the appropriate test, and the state prevails. If the court concludes that the political function exception does not apply for the legal permanent residents, what the court can do is say that for everyone but the legal permanent resident, rational basis applies, is met. For the legal permanent residents, the court can construe their challenge as an as-applied challenge brought by the named legal permanent residents. Strict scrutiny applies. The political function exception does not, and the state loses with respect to the legal permanent residents. So, Your Honor, there's a – That's a pretty novel argument. The problem is that there's no really authority that I see anywhere for the application of such a bifurcated approach. With respect, Your Honor, the authority for the bifurcated approach is inherent in the cases that talk about the political function exception because in every one of those instances, it was a legal permanent resident who was bringing the action. I'd ask the court to consider this. If in those cases an illegal alien had been the challenger, how would those cases have turned out? The political function – Right, but then if you have an as-applied challenge by someone who's unlawfully in the country, they're not going to prevail. Exactly. Or if you have an as-applied challenge from a temporary worker who has temporary work authorization, for that person, rational basis would still apply and they wouldn't prevail. What rationales did you offer us for applying the political function exception? For the political function exception, there is a two-part test that's discussed in the cases. It's not exhaustive, as we say. And so the argument that we make for the political function exception applying is this is a targeted provision, so it's not over-inclusive or under-inclusive. It's focused on third-party voter registration groups. And for this targeted provision, it goes to something that is critical to the election administration process, elections being critical to the functioning of a representative democracy. This is the language from some of the cases, Your Honor, and so the political function exception should apply. The argument boils down to this. Three PVROs are fiduciaries of the voter. They're extensions of the elections officials who help people register to vote. So the three PVROs are doing an inherently political function. They are unlike, for example, the Japanese fishermen who were excluded from fishing three miles off the coast of California shortly after World War II. They are unlike the laundry men and women in Yikwu who were pursuing an economic interest. They're unlike notaries even. Notaries, the alpha and omega for a notary is not to do something that furthers the sovereign's election administration process. Notaries do all kinds of things. Three PVROs, the alpha and the omega. The only thing that they are tasked with doing is taking a form from a voter and giving it to the appropriate elections official. That's a critical part of the election machinery. For what it's worth, I think that's a pretty good argument. I don't know. Maybe I need to re-read your briefs. I found your briefs a little thin on that point. It seemed to me that the main argument you were making was that maybe people who are not citizens would suddenly leave the country before handing over the voter registration documents. That didn't seem to quite carry the day with me. I didn't necessarily hear you making these arguments you're making now. Where did I miss those? Your Honor, in the papers, I apologize for not making them in a crisper way, but the argument about the fiduciary duties that these three PVROs have is in our initial briefs. If you look at the discussions of Cervantes' case from the former Fifth Circuit, we talk about how the election administration function is important and it's critical, and that's in our papers. Yes, Your Honor. You're about out of time, but this is an important case. I'd like to give you two more minutes to address the retention provision. Thank you, Your Honor. For the retention provision, we cite in our briefs a link to the voter registration form. The voter registration form gives us the ambit of the information that is being exchanged from the voter, purported potential future voter, to the three PVRO. And that form says that all the information, your phone number and email address, is provided become public record except for the following. The Florida driver's license number, Florida ID number, and your Social Security number. We look at the statute that the Florida legislature passed. It said you can retain, pardon me, that you cannot copy certain information, which is the Florida driver's license number, Florida ID number, and the Social Security number. And just so, since I had to submit a lot of documents in my time as an official in Florida, that information, though, because it is public, it's still uploaded, but it's blacked out, that information, is my understanding of how that works. Your Honor, it is not blacked out for ordinary Floridians. If you are a judge, for example, or you're a prosecutor, that information is blacked out for other reasons. So that information, so if someone wanted to see the registration information of this individual, that information would be available, or it's not available? So, Your Honor, here's the information that's available. We've got the voter registration form. It's got the date of birth. The date of birth is available. It's got your Florida driver's license number, Social Security number. That is not available. Good. Does it have your mother's maiden name, too? I mean, okay. The back page is just the addresses for the supervisors of elections. So the information, the entire universe of information that is included and excluded exists on one side of one piece of paper, and the Florida statute discusses which things are actually excluded. Now, the arguments being made, we don't know what information excluded. We've got a pretty good list, and that list is not exclusive because it's got the such as showing that it's illustrative. However, the form, which can be changed through rulemaking. Would the statute apply to the mailman who delivers a ballot? It would not apply to the mailman who delivers a ballot. And, Your Honor, here's the distinction. It does not apply to the mailman. It does not apply to the person who is working. That's clear from the statute? Yes, Your Honor, it is, because third-party voter registration organization is defined elsewhere in the statute. So the statute would not apply to the Postal Service. But, again, Your Honor, Postal Services are government agencies. The Postal Service has its own police force. Three PVROs, we have no oversight over. We don't know who's training them, how they're being trained, what measures they have. So it's appropriate to make a distinction. Supervisor? Precisely, Your Honor, we have a rule, a security rule for supervisors, for other election administration officials. The Postal Service has their own police force. For three PVROs, what do we have? None of that. So I think it's appropriate to make a distinction between three PVROs and others. And for the retention issue, the challenge is a vagueness challenge. It is a facial vagueness challenge, yes, Your Honor. Resulting in criminal penalties. You can go to jail. Yes, Your Honor, you can go to jail. But regardless of whether or not criminal penalties are triggered, the test is the same. The question comes down to is there an understandable court? We, of course, give less tolerance to statutes carrying criminal penalties if there's a constitutional objection, don't we? That's correct, Your Honor. So I guess one way to consider this, and Your Honor, I've lost track of time. Answer the question. Yes, Your Honor. For criminal penalties, we do look at the statute harder, but the test is the same. And so the question still comes down to is there an understandable court? Gotcha. Thank you. All right. Mr. Cepeda-Duray, am I pronouncing your last name correctly? Cepeda-Duray, Your Honor. Cepeda Duray-X. Good morning, Your Honors. And may it please the Court for Your Honor. Cepeda Duray-X for the Hispanic Federation Plaintiffs. The plaintiffs are splitting their time this morning. As my clients only bring the equal protection challenge, I'll be speaking to that issue, and then I'll yield to Ms. Khanna. Your Honors, the defendants ask this Court to blaze a new trail and, for the first time ever, apply something less than strict scrutiny to a blanket classification based on alienage. But the law here is clear, as the panel just said. Categorical crimes drawn on alienage are inherently suspect. That's from the Bernal case. And the Supreme Court has kept that one each time it has considered a blanket classification that targets alienage, starting with Takahashi but then through Graham, through Nyquist, Sugarman. Each of the laws at issue in those cases facially discriminated against all aliens as a class, without differentiation, as the law here does. And the Court said that they were presumptively unconstitutional and struck them down in full, without differentiation, as to the aliens that could be subclassified under that blanket classification. The State, Mr. Drusil, cannot change that precedent. Instead, the State looks to the no set of circumstances test or framework that's learned applies. But, Judge Brandt, you're absolutely right. Judge Marcus's decision for the Court in Club Madonna gives us the best way to look at Salerno. Salerno asks us to look at the proper constitutional test, the constitutional framework. Once that test is satisfied or once the Court is satisfied that that is the applicable test, it applies it. And here, that test is strict scrutiny. Again, those cases, Bernal, Nyquist, a line of at least six— But do you agree or not? I mean, I'm interested in hearing your answer. Do you agree that strict scrutiny is not applied if you consider a noncitizen who is unlawfully in the country? Your Honor, the Supreme Court has applied a lower tier of scrutiny for undocumented noncitizens, for example, in the Plyler case. But the first step is always to look at the law. Black letter equal protection law says you look at the classification that the statute draws. And here, there is no subclassification between undocumented noncitizens. The law as written divides between U.S. citizens and everyone else. What about the public function exception, though? Because it seems that the cases where those laws are found to be equal protection violations were cases where noncitizens were being excluded for more reason, intending to exclude those people because they were not citizens, rather than intending to keep the political core function limited to citizens. I know it can seem like a fine distinction, but I think it's an important one. It seems to me that there might be some tension in your argument that these third-party voter registration organizations are so crucial for our democracy and crucial for voters and really important to having the people be heard in our democratic process. But also, there should be nothing about the political community of citizenship in terms of who gets to be so deeply involved in that process. Can you sort out that tension for me? I agree. It's an important distinction. Things can be two things sometimes. The three DPROs can be doing incredibly important work for their communities and to ensure that the voters of Florida are able to register. But the political function cases, the political functions cases are specific and speak to the right of citizens to be governed by other citizens. They speak to control. That is why it is a very narrow exception that has only been applied by the Supreme Court in cases like Foley involving police officers walking the beat, in cases like Cable involving probation officers that have control over whether someone is detained or not, and Ombak, which related to public school teachers. Do you think, though, I mean, I don't necessarily think that today you and your organization would be likely to argue that LPR should not be able to be public school teachers because that's too central to guiding our children, right? I mean, it seems that the language of some of these cases maybe runs up against some tension with what they're actually doing. I mean, I suspect that many states allow a wide variety of people to be assigned citizens to serve as public school teachers. I would assume so, Your Honor. I don't know off the top of my head, and I would not be making that argument. There would be no reason for you to look into that. But I would point the court to the very case that the defendants cite for their argument. The Cervantes case from the old Fifth Circuit here makes the point. The exception is so narrow because the board of Cervantes was a great example. That board had a power to allocate between $5 million to $10 million in 1981. So we're talking over $30 million in today's money. And the court in Cervantes said that that level of discretion surpassed even that of a police officer or a public school teacher. So it again boils to the fact that the political function and exception is about discretion. It is about the rights to be governed and controlled by other citizens. The issues here are about coercive control in the case of police officers and probation officers. This case, Your Honors, is like Bernal. The notaries at issue in Bernal handled very sensitive matters and had discretion to even refuse to take them on. Notaries in Bernal had discretion to refuse to notarize deeds, to notarize mortgages, sensitive matters that affect the daily lives of citizens, much like police officers, much like public school teachers. And the Supreme Court still said that those roles were ministerial and clerical because they were so highly regulated. The state has been adamant on this. Three PVROs are highly regulated. They are cogs in the machine. When you bring up notaries, I can't resist asking if you're familiar with the Georgia Hero 3 or Letterman, who is often tweeting about his notary status and how crucial it is. No, your face says no. Well, anyway, he would definitely agree that notaries are a crucial part of our democracy. But notaries have licenses, correct? I mean, they normally are regulated by the State of Florida. I'm sure they're part of the Department of Business Regulation where they have a business license and they can get their business license suspended. But here, I mean, how is it ministerial for someone to collect registrations? I mean, there's nothing in the State of Florida that says that they regulate these individuals. Your Honor, I would disagree. I believe Mr. Gissel explained how highly regulated three PVROs are in the State of Florida. And the appellate record that they have submitted has several violations that they have assessed against or levied against three PVROs. The problem here is that none of those violations go to the problem that they have purportedly identified in saying that by denying all noncitizens the chance to help register other voters, they are somehow furthering the purpose of having timely delivered applications. To borrow from Chief Judge Walker's opinion, they have not married the two at all whatsoever. And because they have drawn a classic alienage classification, we are in strict scrutiny land and the State just can't meet that test. I see my time is up, Your Honor. All right. Thank you, Counsel. Ms. Khanna. Thank you, Your Honors. Good morning. May it please the Court. Ava Khanna on behalf of the Florida NAACP plaintiffs. I'll be addressing both the provisions at issue today, but I'll quickly pick up where my colleague left off on the political function exception. I understand the confusion, but I think that we can distill it down to a few key factors as set forth very clearly in the Bernal test. In Bernal, at page 226, the Court raises the same questions Your Honor has raised. Your Honors have raised about, well, isn't this an important conception? It can have really serious consequences. And what the Court says is what distinguishes personnel from those to whom the political function exception applies is that the latter are invested either with policymaking responsibility, broad discretion in the execution of public policy, or the routine exercise of authority over individuals. But does Bernal really set that up as a test, or is that one of many things that describe the exception in that case? For instance, I see the exception that has been labeled the political function exception applies to laws that exclude aliens from positions intimately related to the process of democratic self-government. Why isn't registering voters intimately related to the process of democratic self-government? Bernal does establish it as a test. It's a very clear two-factor test. And when it uses that phrase, it uses it as a modifier for the broad discretion and policymaking authority that defines the function, that separates the function from other things. And here, the very language that my opposing counsel relied on to suggest that the political function exception should apply actually just says the opposite. Defendants have conceded below that canvassers are not vested with discretion and do not engage in policymaking authority. Those are the two key portions of the Bernal second-factor test. And here in their brief before this court, they say again, as my colleague said today, that the alpha and omega of a 3PVRO's authority is to deliver a form from one place to another. That's it. That is not policymaking authority. That is not broad discretion. And that has no authority over any other individual. Then I'll go back to the question I asked your friend at your table. Why, if all it is is dropping things in the mail, then why do your organizations conceive of it as so crucial to the political process to have this going on? We believe that it is vital, important work. Is it crucial to the election administration process? No. Is it important to the First Amendment rights of our clients? Yes. But is it vital to the democratic process and political community in our country? I don't think it's the sine qua non of election administration the way other political functions would be. This is something that our clients are exercising, we believe, important rights and performing an important service in a private setting, in a private nonprofit setting that is highly regulated. They have to register with the state of Florida. And the state of Florida has told them they have no discretion. They've got no policymaking authority. They've got no authority whatsoever. So they're not registering voters, they're just collecting or handling applications. Is that my understanding? I think by defendant's concession, they view this function as basically a delivery mechanism. But the form that they're handing out is a voter registration form, no? Am I incorrect about that? Absolutely. It's not like just collecting general information. It's a voter registration form, and then they're supposed to turn that in to the Secretary of State or whoever the election official is in the area that they're collecting the materials. Yes, and you're right. The voter registration form is an important form, just like the things that notaries document can be highly important. In fact, notaries often document things that are related to elections. And in Bernal, the court addressed this. They're not contributing anything to the forms or anything. They're just handling, collecting, and sending it back to the supervisor of elections. Is that all they're doing? Exactly. It's the function, Your Honor. The importance of the form, the importance of the service. They don't have to sign and witness the form or do anything like that? I mean, they don't serve as notaries, to be sure. And while the state makes much of the fact that they serve as fiduciaries, all that basically means is they are—it's important that the voter registration form— I saw a form in the record, but I guess maybe that's just—it's a timesheet, maybe? Do you have like—it looked like there was a form where it had five hours and then it had a number for the number of forms collected. Maybe that must be like a form that's individual to the organizations? Yeah, I think that's right, Your Honor. I think that they keep a number of documents to make sure that they're tracking who they've registered precisely to defend against potential alleged violations here. But that—again, the importance of the form is not the key factor. In Bernal, the court said that the notary function is extremely important. I mean, if we're talking about the—in examining board or in other cases, the courts have said that members of the state bar, right? These are fiduciary—I mean, a lawyer is a fiduciary to a client like nothing else, and these are very important functions. But the importance of the function is not the same as saying it is a political function exception. That requires policymaking, that requires broad discretion, and it requires authority. But do you think teachers make policy? I think teachers exercise broad discretion in the classroom, and that is exactly what the Ambach case says, is that when, you know, they're not following a script, they're not doing a rote activity. They are deciding what curriculum and how to deliver that curriculum, and it is that discretion, that broad discretion, that makes it fall clearly within the Bernal test for political function exception. In my remaining time, I'd like to turn to the information retention ban and make clear that the due process violation is inherent in the vagueness of the terms of the statute. The statute prohibits retention of personal information, but personal information is not a term with a singular meaning, not as a matter of Florida law. Right, but doesn't the statute specifically say that the information that is the problematic information that the state does not want to be retained is the voter's Florida driver's license, the Florida identification card number, or the social security number or signature? I mean, those are all very personal, private information that individuals possess. Those are types of information that are prohibited here, but that is not an exhaustive list. It is such as, and so the question remains, what else is possibly included in that? Florida statutes typically define personal information when they use that term, and they define it in different ways. Sometimes it is about that most sensitive information that you just outlined. Sometimes it is about personal contact information. Even as a matter of common understanding, when I go to the doctor's office and they ask for my personal information, what do they usually mean by that? My contact information? Probably. My driver's license information? Probably not. There is no uniform definition, and the fact that they provide this non-exhaustive list, if anything, only doubles down on the confusion. Why doesn't it just mean anything about that person? Right? That seems fairly straightforward. And if that's true, Your Honor, then I, sitting here today, do not know what information is considered personal information. Is it just highly sensitive information? Is my cell phone number and my email address considered my personal information? I would think all of it. If that is clear, Your Honor, that is not at all clear from the statute. The statute says information like the driver's license number, like the Social Security number. It says nothing about whether or not it sweeps that broadly. Right. There are some people for whom my cell phone number, email address, feels personal. It's personal to them. But I believe that the state has argued that it actually doesn't have that broadly. Right. But what the statute says is really you can, it says you cannot copy. So this, like here, this application that someone filled out, you can't copy it for any other reason other than to provide it to the third-party voter registration organization in compliance with this section. So basically you're saying you can't make a copy of this and keep it for your personal benefit. You can copy it and give it to the third-party voter organization, but you can't collect it and copy it for your own purpose. So I'm like, how is that not clear? There are so many questions inherent to that. The term says both copy and retain. 3PVROs typically get contact information so that they can follow up with these registered voters. Can they still do that under this provision? It's unclear. If you read the state's own briefs, what can they do with the information? Let's assume that we even do understand what personal information is, and I don't think that is clear at all. I mean, it says if a person. It doesn't say an organization. It says a person. I mean, the third-party voter organizations are not persons, are they? I would say not. However, in the state's brief, they make clear that at some point a person is bound by the information retention ban, such as when a plaintiff is collecting, but they are otherwise not bound by the information retention ban when they're just handling it. So if they're up the chain of command, then what? Can they use the personal information for any purpose whatsoever? And if you look at the supposed regulation that's meant to clarify, it only, again, doubles down on the confusion because there the state says, actually it does apply to 3PRVROs generally. There are several times in the state's brief. On page 24 of the state's brief. So this really says it's about the information that you collect with your voter registration applications. I mean, there's nothing in there that says that at the time that you're registering people that you can't have a separate thing saying, would you like to have information collected so that we can contact you for other things. Your Honor, I mean, I think that reasonable minds could be very varied on it. I mean, I think that's fair. I think it's a fair reading of the statute. But all I know is if I, sitting here as a lawyer, whose job it is to parse the language and spent days doing that, I don't really understand what is prohibited and what is not. And so that's not just a matter of idle curiosity. Here we have ordinary people who can accidentally, with no sign to requirement, stumble into a felony conviction because they don't understand what line distinguishes lawful from unlawful. I would submit that even the state does not understand what line distinguishes lawful from unlawful. And there's nothing in the state's brief, nothing in the statute, nothing in the regulations that clarifies that line for a reasonable person to know I can do this, but I can't do that. I can do this when I'm acting as a collector. I can't do this when I'm acting as a handler. I can collect some personal information, but not all personal information. I can retain it for some purposes and not others. All of these questions remain outstanding, and all of these questions remain unanswered by the statute at issue, and therefore it is unconstitutionally vague. All right. Thank you, Ms. Khanna. Thank you, Your Honors. Mr. Ferguson, on behalf of the League of Women Voters. Good morning, Your Honors. This is Brent Ferguson representing the League of Women Voters of Florida as amicus. May it please the Court, I'd like to address both points today, the personal information restriction and add a brief point on the citizenship ban. I'd like to start by addressing a question that Judge Lugoa just asked about focusing on who this statute applies to and what they can do with the information. Judge Lugoa, I believe you asked Ms. Khanna, if someone is collecting voter registration applications as a volunteer, are they allowed to separately take someone's information and retain that? And I would argue that by the terms of the statute, that's clearly not allowed, although the state may argue it is. The statute might include applying for persons collecting voter registration applications on behalf of the three people. It says they can't retain any of the voters. I ask that question because obviously, like the League of Women Voters, you're not just in the business of registering voters. You also do candidate forums. You also do forums involving particular policy issues. So I guess the question I have is, I mean, there isn't anything that precludes an individual to say, hey, we have a candidate forum coming up on, I don't know, a school board, and would you like us to contact you so that you can attend? Your Honor, I would say by the terms of the statute, if you do that as part of collecting a voter registration application, it would likely violate the law. I agree that you could separately do that, certainly. But by the terms of the statute, that wouldn't be allowed, and that creates a big problem for the League, as you point out. Couldn't the purpose of that be to keep third-party voter registration organizations to what it is that they say that they're doing, which is registering voters, rather than kind of reaching these people for other purposes? Your Honor, that very well may be the purpose, but I think the focus here is on the vagueness of this law and the organizations not knowing what they're allowed to do. Now, of course, there's a First Amendment issue with regard to this provision as well. I believe the state's making a narrowness argument in response to that. I do think that there's First Amendment interests that the League and other organizations have in retaining someone's information to ask them to be a member. That's not an issue right here. But what I'd like to drill down on a little bit that we haven't addressed yet is what I think is the real core problem and the real core vagueness of this statute, and that's who it applies to. So the statute, as I just said, applies to anyone who's collecting voter registration applications as a part of a 3PV program. And the state argues in its briefing that this only applies to volunteers who directly collect an application from a voter. But, of course, by the terms of the statute, it would also apply to anyone who's a supervisor supervising several volunteers, and that's because it uses the term collecting. Let's start with the text, the first reason that this is unclear. The state uses Merriam-Webster to define the term collecting as gathering from a number of persons. Now, clearly, of course, that applies to someone who's a volunteer gathering directly from voters. But it also applies, of course, to someone who's a supervisor and is supervising five volunteers who then bring their applications together and the supervisor collects it. And so the state's narrowness argument is simply atextual, and that creates a problem. The legislature clearly could have written the law to say it only applies to people who are collecting directly from voters, and it doesn't do that. What would be the purpose of such a – I've got questions for them about why they would narrow it that way, because if your goal is to avoid these organizations retaining the forms, I don't know why you would intend for it only to be the person who receives it in the first place. That's exactly my next point, Your Honor. It's nonsensical to make that argument because it creates such a narrow statute that it doesn't serve the purposes. Now, the state argues that its purpose is to, as you said, Your Honor, protect people's private information. But if it can be completely avoided by simply handing the application to anyone else that works at your organization, or really anyone else in the world, then there's no reason to have that statute.  May I ask you just a question? I'm just kind of curious about sort of how it works. So when you get this voter registration application, it says you have to provide a valid driver's license or a Florida ID number. And if you don't have one, then that's when you give your Social Security number. But does the person who is registering, do they have to provide the Florida ID to the person who is collecting the information? I'm just curious. Do they have to provide their ID? Do they have to, like, so the person confirms that this is who the person is or not? Your Honor, if they're doing the registration online, they do. I don't think there's any rule that they have to hand their ID while they're doing a paper registration. But I'm not 100 percent sure about that. Okay, thank you. Very quickly, the third reason that the state's interpretation doesn't make sense is because it conflicts with the rule they promulgated in this case. Now, the state is arguing on appeal that, as I said, this statute only applies to people directly collecting applications from voters. But the rule is much broader, and it says three PVROs as a whole aren't allowed to do this. Now, as Your Honor, Judge Grant said, that would make more sense with regard to the purpose of the statute. But that's not what the state is arguing here, and the rule certainly goes far beyond that. What do we do if we think the plain reading of the rule is broader than the state says it is? What does that do? If I think it just covers everything, obviously, and the state is saying it covers less, is that still vague, or are they just arguing for a too narrow approach to the statute? And it can stand because, obviously, it just covers what it covers. Of course, the rule is being challenged here right now, and I would say the purpose of this argument here is just to lay bare how the state's narrowness argument doesn't align with their actual belief as to the coverage of the statute. That's the simplest way to think about it, I think. And I see my time is almost out. I'd like to say very quickly on the citizenship ban. The state mainly makes the Salerno argument, arguing the rational basis applies. The state also gave you the option today of severing the statute, and saying that if the statute is unconstitutional, is applied to legal permanent residence, then it can be partially struck down. Now, that argument is abandoned. If Your Honor, if I could take 30 more seconds to go into it. Now, that argument has been abandoned on appeal. And the important point here is that if the state wants to argue that a statute should be severed, then that's a complex argument because the Supreme Court has said in cases like Reno versus ACLU that judges shouldn't rewrite statutes and they should allow the legislature to do that. Very rarely does a court go into a statute and strike down part of it and not strike down another. Now, the state could argue that this is an appropriate case, and they have not done so on appeal. And so I think it would be inappropriate at this point on appeal to do that severing. All right. Thank you, Mr. Ferguson. Mr. Giselle, you've reserved some time for rebuttal. Thank you, Your Honor. I'd like to talk. Can you talk about the last argument made by counsel for the league, which is accurate, which is that we do not rewrite statutes? That is entirely correct, Your Honor. And my friend may be misconstruing my argument. My argument is this. They bring a facial challenge. The court can construe a facial challenge as an as-applied challenge, and it would be an as-applied challenge brought by the legal permanent residents who are the named plaintiffs in this case. If they later certify a class of legal permanent residents, that's another issue. That brings us into the Cabel territory because there, there was a certified class of legal permanent residents who were challenging something. So my friend seems to be misconstruing that argument. So you would want us to say that it is, the statute is valid as applied to their one plaintiff? Well, Your Honor, I would like you to say that the statute is not constitutional. But if Your Honor does not believe that the political function exception applies, then Your Honor can construe the plaintiff, plaintiffs. I don't remember off the top of my head, Your Honor, how many of them are legal permanent residents, but there is at least one. That as applied to them, this statute is unconstitutional. If later they wish to certify a class of legal permanent residents, that would be the appropriate way to get the kind of class-wide relief they're seeking. But that hasn't happened. Wouldn't the rules of precedent end up giving them the kind of class-wide relief they were seeking anyway? I mean, it's different if a district court does it. But once the circuit court that has authority over Florida says that, then why would they need a class? Fair question, Your Honor. And as a practical matter, the State would abide by the published opinion of the 11th Circuit. Your Honor, I would also like to focus on a couple of other things that were said about the political function exception. My friends try to read a rigid formalism into the political function exception's two-part test. That does not exist. Your Honors, I'd point you to the Burnell case, which is the one they rely on. Burnell says on page 225, the task under the second prong, which is the discretion, et cetera, is whether or not the exclusion implicates responsibilities that go to the heart of the democratic government. It talks about how the test is not exclusive, and then it talks about how the actual function of the position is dispositive. If we look at Cervantes, the function prong is what Judge Wisdom, writing for the former Fifth Circuit, focused on. The function is what's critical. When we're looking at the function, we know that folks who are sitting on juries can be citizens. Folks who vote can be citizens. Lawyers who appear in front of those juries, Griffiths, the United States Supreme Court said, they don't need to be citizens. So the function is a critical issue. What about the fact that this is all very rote? They are supposed to get the form, have the person fill it out, encourage them to fill it out, and then turn it in. As I understand that argument, Your Honor, it's that it's rote, and therefore there's nothing to see here. It's not a part of the election administration process. I vehemently disagree. If someone turns in a form to one of these organizations, and they do not deliver it, the person cannot vote. The person misses the registration deadline. They are not on the voter rolls. They cannot vote. How does that not go to the very heart of the democratic process? If you have someone who is responsible for delivering a form, and their failure to abide by that one sole task can have this consequence of you being excluded from the political community and having a chance to say what's what, that is a crucial function that goes to the very heart of the democratic process. Therefore, I submit that the political function exception is met, Your Honor. Your Honor, we also talked a bit about Club Madonna, and I'd like to hit that point once more. The argument is being made that Club Madonna does not – Club Madonna says that Salerno does not lay out a test for facial challenges. True. Facial challenges are assessed based on what the underlying argument is. So if it's a Fourth Amendment issue, you consider what the Fourth Amendment tests are. If it's a First Amendment issue, you consider what the First Amendment tests are. Here we have an equal protection issue. So what is the equal protection test? The equal protection test requires us to figure out what level of scrutiny applies. And for citizens, it is unlike race. It is unlike national origin. It is unlike sex. For citizens, there are a series of tests, a series of levels of scrutiny that could apply. And that's our Salerno point in a nutshell, because when you look at citizens, citizens do not trigger one level of scrutiny. Different levels of scrutiny – Right, but that's really – that's truly a case of first impression for anyone. First impression, yeah. I mean, that is an alien – it's an alien case that involves both LPRs, people lawfully in the country, and people unlawfully in the country. And there clearly are two different standards of review for both. First impression, yeah. The court considers this. If in the alien education of the United States Supreme Court, someone other than a legal permanent resident had filed a lawsuit, how would those cases have turned out? They would have turned out differently. So the alienage cases from the United States Supreme Court, consider them in the context within which they arose, with legal permanent residents filing the challenges. Here we have more than just legal permanent residents filing the challenges. Your Honor, I'd like to move on to the retention provision briefly. The argument is being made that we don't know what information falls within its ambit. I asked the court to look at the voter registration form. The voter registration form on the top left has a section that says public record. It tells you that all of the information in the form is a matter of Florida public record. Anyone can ask for it with a few exceptions. And those few exceptions are then provided as illustrative lists in the statute. Why? Because forms are a product of rule. So the statute does apply to supervisors who get the supervisors of these third party voter registration organizations, as well as those who bring the applications in? Your Honor, the limitation on which information can be given out applies to the supervisors as well. So if you go to a supervisor of election and you ask for certain information. What about a supervisor at a third party voter registration organization who collects it when it comes in to the office? Okay, so if I understand Your Honor's question, it's a third party voter registration organization giving a form to the supervisor of election. Right. So the supervisor of elections takes the form because they have a statutory obligation to take it and try to put the person on the voter roll. They do actually put the person on the voter roll. So they have this information. The supervisors are part of the election administration process. So they must have this information. The signature is then a crucial component. We put in our papers about how the signature is used to A, detect fraud, and B, actually. So if that person copies or retains information from the application, that person is also subject to third degree felony? That person at the supervisor of elections office? No, Your Honor, because the statute applies to the third party voter registration organization. No, I think perhaps I misunderstood. I have a related question that I did misunderstand, which is if there's a supervisor at the third party voter registration organization, so they send out their five people who collect the applications from people. They bring it back to the man or woman at the head office and they say, here are all these that I collected. And the supervisor of them says, great, I'm going to go put these in the mail. Is that person subject also to this requirement? Thank you, Your Honor. I misunderstood. So it's a supervisor at the third party voter registration organization, not a supervisor of elections. So, Your Honor, that person would not be liable under the statute. That person would violate the rule. The rule applies to everyone at the 3PVRO. The statute talks about collecting. And the reason why we've taken the position we have is because when you read the 3PVRO statute, it uses the words solicit, collect, candid. They're used in different contexts. And so we've taken the position that they mean different things. What if I'm a college student interning in the office? Your Honor, if you're a college student interning in the office. Am I subject to a third degree felony if I handle or copy? You are not subject to the third degree. That's clear from the statute? Yes, Your Honor, that is clear from the statute because the statute uses three different words. Collect, handle, solicit. If, for example, that college student is also engaging in the activities of the League of Women Voters, there are two booths. But if you're handling it, let's say college student interning in the office, take this down to the supervisor of elections office. Is that college student subject to a third degree felony? No, Your Honor, that college student is not subject to a third degree felony. That's clear from the statute? Yes, Your Honor, I believe it is clear from the statute because the words handle, collect, and solicit are used. And, Your Honor, take a step back. Here's the problem we're having. You had Rodrika Corey who was arrested and convicted of taking these forms and doing bad things with them. So if Rodrika Corey or Royal Shepherd who was collecting these forms out in Leon County, if these people are collecting these forms, copying them, taking that information, and committing some kind of other identity theft issue, that would be prohibited by this. This is a check on them. And three PVROs, Your Honor, again, they're made up of people. The collector is collecting the forms and giving them to the three PVROs. But aren't the supervisors people too? I mean, I don't completely understand. I mean, I guess maybe you want to avoid the risk of someone just collecting applications and then copying them for their own purposes and then turning them in. But couldn't the supervisor at the office do so just as easily? I haven't sensed a lot of institutional trust on the part of Florida for these organizations, so that's an interesting distinction to draw on the statute. There is a lot of trust of these organizations. But if you look at the trust matrix, the person who's actually canvassing on the ground, the minimum wage worker who's collecting this thing, someone who has a past felony record because they're doing a minimum wage job, that's different than a supervisor who is a salaried employee who is responsible for making sure things are delivered on time so the organization isn't subject to fine. If you're looking at the level of trust, the level of trust increases as you move up the chain. And as a practical matter, the rule which does not trigger criminal penalties, to Judge Wilson's earlier questions, because the Department of State can't assess criminal penalties, applies to the organization as a whole. So the organization as a whole is also covered. And, Your Honors, I see my time is expiring. It has expired. At the risk of being important, I simply note that this case is fast-moving. We're running into first of all territory soon. And there are pending summary judgment motions on the citizenship provision, which would benefit from this Court's approval. All right. Thank you, Mr. Giselle. Do you mind if we take our break? Thank you. Okay. Take a break.